UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DEBRA ANTHONY**,                                    Case No. 1:11 CV 1400

               Plaintiff,                          Magistrate Judge James R. Knepp II

   v.                                              MEMORANDUM OPINION AND
                                                     ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

               Defendant.

### INTRODUCTION

Plaintiff Debra Anthony seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties have consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court remands the case to the Commissioner.

### BACKGROUND

Plaintiff filed an application for DIB alleging a disability onset date of April 15, 2006. (Tr. 84). Her claim was denied initially (Tr. 65), and on reconsideration (Tr. 72). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 79). Born May 18, 1960, Plaintiff was 49 years old at the hearing, which was held March 12, 2010. (Tr. 37, 63). After the hearing, the ALJ found Plaintiff not disabled. (Tr. 29).

Plaintiff's Vocational Background and Medical History

Plaintiff graduated from high school and completed two years of college, receiving an associate's degree in Respiratory Therapy while maintaining a high grade point average. (Tr. 122,

418). Plaintiff worked briefly as a kitchen aide and for two years as a welfare worker, but most of her vocational experience was as a respiratory therapist. (Tr. 124). She worked as a respiratory therapist from 1998 to 2006, but did not supervise anyone in this position. (Tr. 124, 126).

Plaintiff has a long history of physical and psychological problems. In 1995, she voluntarily admitted herself to the hospital following a suicide attempt. (Tr. 816). She was diagnosed with major depression with suicidal ideation. (Tr. 834). She reported having been under a psychiatrist's care for the past three years, but did not feel her medications were helping. (Tr. 816). Treatment notes indicate no history of psychotic episodes, but there was an indication of past suicide attempts. (Tr. 816, 819). The hospital adjusted Plaintiff's medications, and when they discharged her five days after her admission, her mood was pleasant and she was not suicidal. (Tr. 816). In 2003, Plaintiff underwent cardiac surgery for left heart catheterization, left ventriculography, and coronary angiography. (Tr. 786). Her cardiologist Dr. Krishnan Sundararajan planned to continue treating Plaintiff's cardiac disease aggressively. (Tr. 787). Also in 2003, Plaintiff underwent gastric bypass surgery. (*See* Tr. 319).

On December 3, 2005, Plaintiff presented to the emergency room (ER) at Memorial Hospital of Geneva complaining of right flank pain and right lower quadrant pain, along with nausea and vomiting. (Tr. 301). A CT scan showed Plaintiff's liver was decreased in attenuation, suggesting fatty infiltration. (Tr. 311). Her pancreas, spleen, kidneys, and adrenal glands all appeared within normal limits. (Tr. 311). The same CT scan noted mild degenerative changes in Plaintiff's lumbar spine. (Tr. 312). Plaintiff's then-treating-physician Dr. Josephine Mikhail ordered Plaintiff transferred to a different hospital for a urology consult. (Tr. 306, 339). Plaintiff reported bilateral lower back pain limiting her mobility, pain in the right inguinal area, and loose stool. (Tr. 339).

2

Plaintiff's "[a]bdomen was soft, . . . with focal tenderness in the right lower quadrant region without any rebound, no guarding" and she had normal bowel sounds. (Tr. 340). A CT scan and other tests showed no significant findings. (Tr. 340). The surgical consult did not feel diagnostic laparoscopy was necessary and recommended continued pain control with NSAIDs. (Tr. 340).

The hospital also performed a psychiatric consult, evaluating Plaintiff for possible factitious disorder versus anxiety. (Tr. 340–41). The psychiatrist did not see evidence of factitious disorder, conversion disorder, or malingering, and found Plaintiff did not meet the criteria for somatoform disorder. (Tr. 341). Plaintiff was calm and cooperative, with no abnormal thought content, and the psychiatrist noted she had hobbies. (Tr. 350–51). The psychiatrist recommended Plaintiff follow up with an outpatient psychiatrist to manage her medications. (Tr. 350). At discharge on December 10, 2005, Plaintiff agreed to follow up with general surgery and Dr. Mikhail. (Tr. 341). She understood the hospital test results had been negative for etiology of abdominal pain, although the hospital had not ruled out adhesions. (Tr. 341). Plaintiff's final diagnosis was right lower quadrant abdominal pain of unclear etiology, and treatment records also note her past medical history of depression. (Tr. 341, 346).

Plaintiff returned to the ER five days after she was discharged, again complaining of right lower quadrant abdominal pain, which she stated had been present for about two weeks. (Tr. 267). Dr. Mikhail had a discussion with Plaintiff, apparently leading to the conclusion Plaintiff should go to the Cleveland Clinic, but Plaintiff became unsure whether she really wanted to go. (Tr. 267). Plaintiff had no vomiting while in the ER. (Tr. 268). The on-call surgeon Dr. Goel's impression was that Plaintiff suffered from right lower quadrant pain of unknown etiology. (Tr. 274). He had suspected possible adhesions, a possible distal small bowel pathology, or musculoskeletal pain. (Tr.

3

275). There was no evidence of intestinal obstruction but there was "a very large amount of stool throughout the colon." (Tr. 291). The hospital discharged Plaintiff the following day, stating her "pain was never fully diagnosed and there was no obvious etiology for [it]." (Tr. 282). Additionally, all laboratory investigations were unremarkable. (Tr. 282). Nevertheless, Dr. Goel listed her prognosis as poor. (Tr. 283).

Plaintiff followed up with her cardiologist Dr. Sundararajan in January 2006, reviewing the results of a stress test. (Tr. 378). Plaintiffs lungs were clear, her heart rate and rhythm were normal, and her abdomen was soft and nontender with normal bowel sounds. (Tr. 381). Dr. Sundararajan requested an echocardiogram to reassess her ejection fraction and also requested Plaintiff undergo stress testing. (Tr. 382). Ultimately, the test showed no evidence of ischemia, and Dr. Sundararajan recommended Plaintiff follow up with her primary care physician. (Tr. 378). The  EKG was a "[t]echnically difficult study". (Tr. 380). The test showed low normal left ventricular systolic function, an estimated left ventricular ejection fraction (LVEF) of 50% to 55%, no significant valvular dysfunction, and normal left ventricle diastolic function. (Tr. 380). Plaintiff's exercise capacity was normal for her age, her heart rate and blood pressure responses to exercise were normal, and overall the stress test showed Plaintiff had normal functional capacity with no angina, arrythmias, or ischemic changes. (Tr. 384).

On May 10, 2006, Plaintiff again returned to the Geneva Hospital ER complaining of back, flank, and abdominal pain. (Tr. 221). Plaintiff had vomited seven times that day, and she had a 100 degree fever. (Tr. 221, 226). She was lethargic and had an unsteady gait, her abdomen was soft and tender to the touch, and she reported 8/10 pain. (Tr. 236). Plaintiff was given Percocet, Phenergan, and eventually morphine to manage her nausea and pain. (Tr. 236). A CT scan of Plaintiff's

4

abdomen and pelvis showed "a small apparently benign stable nodule at the right lung base posteriorly." (Tr. 194). The liver, spleen, adrenal glands, kidneys, and pancreas all appeared normal. (Tr. 194). The scan showed postsurgical changes "related to the stomach and to a prior cholecystectomy" and scans of Plaintiff's colon showed a large amount of stool, along with a very small ventral hernia. (Tr. 194).  Examination of Plaintiff's abdomen showed no evidence of intraperitoneal air or intestinal obstruction. (Tr. 198). The examination showed no abnormalities of the visualized abdominal viscera, and no intraabdominal calcifications. (Tr. 198). The doctor noted Plaintiff's previous gastric bypass surgery, suspected a probable gastrogastric fistula, and placed Plaintiff on a clear liquid diet overnight. (Tr. 230).

Treatment notes from May 12, 2006 indicate Plaintiff had intractable pain, secondary to a possible gastrogastric fistula from gastric bypass surgery. (Tr. 240). The notes also indicate uncontrolled diabetes, cardiomyopathy, orthostasis, gastroesophageal reflux disease (GERD), and depression. (Tr. 240). Plaintiff's discharge summary the next day listed her final diagnosis as "[a]bdominal pain secondary to gastrogastric fistula following bariatric surgery" and she was to follow up with a surgeon. (Tr. 243). On discharge, Plaintiff was able to ambulate unassisted and her pain was much more manageable. (Tr. 244).

On July 18, 2006, Plaintiff underwent surgery for partial gastrectomy with revision of gastrojejunostomy to repair her gastrogastric fistula. (Tr. 319, 324). Though the procedure was successful, Plaintiff developed tachycardia and abdominal pain following the procedure, leading to an exploratory procedure to ensure "she did not have an intraabdominal catastrophe." (Tr. 319, 323). There were no complications from the second procedure, and Plaintiff was discharged to her home in stable condition. (Tr. 319, 323). During recovery at the hospital, Plaintiff reported depression and

requested her medication for anxiety and depression. (Tr. 321).

In August 2006, Plaintiff was admitted to the ER with abdominal pain. (Tr. 327). Her abdomen was soft and distended. (Tr. 328). A CT scan revealed a potential perisplenic hematoma, but this was found to be stable, and test results demonstrated no concerns for pancreatitis. (Tr. 328). Because hospital staff ruled out all causes of her abdominal pain, Plaintiff was discharged the next day. (Tr. 328).

Plaintiff returned to the ER October 17, 2006, complaining of abdominal pain, left flank pain, left upper quadrant radiating abdominal pain, fever, nausea, frequent vomiting, and intermittent diarrhea. (Tr. 199). Plaintiff had seen her primary care physician ten days earlier for a urinary tract infection (UTI), at which time a CAT scan of her abdomen was unremarkable. (Tr. 199). In the ER, Plaintiff appeared uncomfortable and had an increased heart rate, but otherwise her vital signs were mostly unremarkable. (Tr. 199). Her ejection fraction was 35%. (Tr. 199). Plaintiff's abdomen was mildly distended, but all bowel sounds were normal and there were no peritoneal signs. (Tr. 199). An EKG "did not show any acute abnormalities", and a CT scan showed Plaintiff's liver, spleen, kidneys, and pancreas appeared normal. (Tr. 214). Plaintiff was discharged in stable and improved condition, diagnosed with left renal colic, microscopic hematuria, and incidental hypoglycemia. (Tr. 200). Three days later, Plaintiff again presented to the ER complaining of abdominal pain. (Tr. 335). Treatment notes state Plaintiff "continuously reports low-grade fevers, nausea, chills, and diarrhea." (Tr. 335). The record indicates Plaintiff had a possible partial small-bowel obstruction, but this was resolved and she was discharged in stable condition. (Tr. 335).

In early 2007, Plaintiff began seeing Dr. Thomas Hunt as her primary care physician. (Tr. 657). Plaintiff reported falling frequently, balance problems, and lightheadedness. (Tr. 657). Dr.

Hunt noted Plaintiff's worsening depression and her Cymbalta prescription, and the records indicate she was tearful. (Tr. 657). Plaintiff also mentioned pain problems and a number of other current and past medical issues, indicating she found it difficult to perform a daily routine. (Tr. 657–58). In March 2007, Dr. Hunt found some tenderness in Plaintiff's abdomen, indicating she had a UTI and abdominal pain. (Tr. 655). A test completed March 21, 2007 stated "Crohn's Disease Predicted" (Tr. 665), and in April 2007 Dr. Hunt prescribed Phenergan for Plaintiff's gastroenteritis (Tr. 653). Plaintiff had reported cold symptoms, nausea, and severe diarrhea, but her abdomen was soft and nontender. (Tr. 654). The next day, Plaintiff reported her diarrhea had stopped, but she was still nauseated. (Tr. 659). She also complained of feeling very weak. (Tr. 659). She had been reading about Crohn's disease, and believed she could have it. (Tr. 659). She reported needing help getting out of bed in the morning. (Tr. 652). Her abdomen was diffusely tender (Tr. 652), and treatment records indicate Crohn's disease, depression, diarrhea, and adhesions (Tr. 652). Later in April 2007, Plaintiff reported medication was helping considerably with her loose stool problems, and examination showed her abdomen was soft and nontender. (Tr. 651).

May 3, 2007, Plaintiff reported to Dr. Hunt's office requesting an increase in her depression medication because she was experiencing suicidal ideation. (Tr. 649–50). She presented as tearful and also reported "explosive diarrhea". (Tr. 650). Dr. Hunt noted her abdomen was soft and nontender, also indicating depression and anxiety. (Tr. 649). At her next visit to Dr. Hunt – approximately two weeks later – Plaintiff was diagnosed with a UTI. (Tr. 647). She reported frequent falls, lethargy, weakness, and dizziness, in addition to nausea and pain. (Tr. 647–48). An EKG on May 16, 2007 showed the right side of Plaintiff's heart was normal, and her cardiac valves showed no evidence of significant valvular heart disease. (Tr. 357). Her left ventricle, however,

showed mild global systolic dysfunction. (Tr. 357). The left ventricle's size and wall thickness were at the upper limits of normal, and Plaintiff had a LVEF of 45%. (Tr. 357).

In June 2007, Plaintiff once again reported to Dr. Hunt's office complaining of pain. (Tr. 645). His treatment notes indicate her abdomen was soft and nontender (Tr. 645), and he noted a seizure disorder and chronic abdominal pain. (Tr. 645). On June 19, 2007, Plaintiff went to the Ashtabula County Medical Center following multiple seizures, during which she had fallen. (Tr. 505–06). She was diagnosed with a seizure disorder. (Tr. 505). Plaintiff's gait and station were normal; she had normal speech, motor, and sensory function; her abdomen was not tender and had normal bowel sounds; and her respiratory and cardiovascular exams were normal. (Tr. 507). Plaintiff was advised to follow up with her treating physicians. (Tr. 507).

Neurologist Dr. Gary A. Mellick's impression was that Plaintiff may be having complex partial seizures or atonic seizures. (Tr. 485). She reported headache pain of 5–6/10 without medication, and also stated she felt her seizure events occurred more frequently since starting a particular seizure medication. (Tr. 485). A recent EEG was "an abnormal [EEG] in an awake patient . . . due to asymmetric slowing with slowing on the right hemisphere greater than the left . . . accentuated with hyperventilation." (Tr. 487). The EEG was also abnormal due to epileptiform discharges, suggesting potential seizure disorder. (Tr. 487). Through the rest of June and July 2007, Plaintiff continued to see Dr. Hunt for chronic abdominal pain, UTIs, and seizure disorder, but she told Dr. Hunt things were "going a whole lot better" on her new seizure medication and her symptoms had decreased. (Tr. 642–44, 639–40). On July 30, 2007, Plaintiff returned to Dr. Mellick for a follow-up neurology appointment. (Tr. 483). She had forgotten to have a lab test performed, and reported a headache with a pain level of 7/10, but denied any falling or major seizures. (Tr. 483).

8

On August 3, 2007, Plaintiff went to Dr. Hunt's office complaining of nausea, vomiting, diarrhea, and abdominal pain. (*See* Tr. 909). During the appointment, she had a seizure that lasted several seconds. (Tr. 909). Plaintiff was confused after the seizure event, and Dr. Hunt had her transported to the ER for further evaluation and treatment. (Tr. 909). The next day, still in the ER, Plaintiff was tired and expressed difficulty sleeping, but her condition had improved. (Tr. 638). She reported diffuse abdominal pain and joint pain, but denied chest pain, and her diarrhea had improved. (Tr. 638). On August 6, 2012, Plaintiff reported increased abdominal tenderness and had experienced a seizure at one point that day. (Tr. 603). Dr. Hunt's assessment and plan discussed Plaintiff's seizure disorder, nausea, vomiting, and diarrhea, also noting her history of medical noncompliance. (Tr. 603). Plaintiff remained stable throughout the ER visit, and her diagnoses at discharge on August 7, 2012 were seizure disorder, Crohn's disease exacerbation, headache, muscle aches and pains, and intractable diarrhea. (Tr. 621, 909).

Back at the hospital on August 9, 2007, Plaintiff was admitted complaining of seizures and a Crohn's disease exacerbation. (Tr. 598). She was diagnosed with breakthrough seizures and given intravenous valium, with plans to start her oral medications again. (Tr. 598). Plaintiff also complained of weakness. (Tr. 615). Her labs showed depleted potassium levels, but they increased after being supplemented and she was discharged home, with instructions to return to Dr. Hunt's office on August 13, 2007 for additional blood work. (Tr. 615, 627). Plaintiff was to call Dr. Miller for a followup appointment regarding her seizures and was to see Dr. Hunt as well. (Tr. 618, 625). Plaintiff presented to the ER twice more in August 2007. (Tr. 490, 613). Once, she complained of confused thoughts and balance problems, with slurred speech and a limited range of motion, but her neurological exam was normal. (Tr. 490, 494). A CT scan showed a normal brain with no significant

changes from a previous study, and Plaintiff was instructed to follow up with her family doctor. (Tr. 495, 500). The second time, Plaintiff complained of seizures and exacerbation of Crohn's disease. (Tr. 613). She was admitted by the ER and had dehydration and UTI symptoms, as well as nausea, vomiting, and diarrhea. (Tr. 613). She was unable to keep her medications down and consequently had a grand mal seizure. (Tr. 613). Dr. Hunt was unable to complete satisfactory review of Plaintiff's systems due to Plaintiff's obtunded mental status. (Tr. 613). Plaintiff appeared somewhat postictal and fatigued. (Tr. 613). Her lungs were clear; her heart rate and rhythm were regular; and her abdomen was soft and nondistended, but diffusely tender. (Tr. 613).

Plaintiff also reported to the ER twice in September 2007. (Tr. 594, 634). The first time, she complained of chest pain and was admitted for observation after an EKG revealed changes from her previous EKG. (Tr. 594, 629). She was discharged the following day in satisfactory condition, and was to see cardiologist Dr. Sundararajan and treating physician Dr. Hunt within the next week. (Tr. 629). The second time Plaintiff went to the ER, she was admitted for orthostatic hypotension. (Tr. 634). Certified Registered Nurse Practitioner (CRNP) Donna Workman was consulted regarding evaluating Plaintiff's depression. (Tr. 634). During Workman's evaluation, Plaintiff appeared well-nourished, with good hygiene. (Tr. 636). Workman described Plaintiff as pleasant and cooperative. (Tr. 636). Plaintiff had a flat affect and depressed mood, but was able to communicate her thoughts and feelings effectively. (Tr. 636). Plaintiff expressed feelings of hopelessness, worthlessness, and hypochondriasis, and was very focused on her illness and pain, but denied suicidal thoughts or plans. (Tr. 636). Workman recommended Plaintiff stop taking a medication that could increase seizure risk and diagnosed major depression, severe and recurrent, generalized anxiety disorder, and panic attacks, and she assessed Plaintiff a global assessment of functioning (GAF) of 41/50. (Tr. 636–37).

10

Plaintiff indicated she would follow up with Workman after being discharged, and also stated she wanted psychotherapy. (Tr. 636). The following day, Plaintiff left the hospital in satisfactory condition, with instructions to follow up with a number of people, including Workman. (Tr. 634–35).

September 20, 2007, Plaintiff denied experiencing any chest pain when she followed up with cardiologist Dr. Sundararajan. (Tr. 374). She reported fleeting lightheadedness, but denied any syncope and reported no shortness of breath or orthopnea and had no lower-extremity edema. (Tr. 374). Treatment notes indicate Plaintiff "ha[d] no trouble taking her medications." (Tr. 374). Overall, Plaintiff showed no signs of decompensated heart failure. (Tr. 375). The cardiologist recommended a nuclear stress test to rule out ischemia. (Tr. 375).

In October 2007, Plaintiff was referred for physical therapy to focus on general conditioning, endurance, and strengthening of her trunk and lower extremities. (Tr. 519). At her initial evaluation, Plaintiff reported using a cane when her pain was bad, and she was diagnosed with arthritis and weakness. (Tr. 523). Still, her hips, knees, and ankles were reported as having 4/5 strength. (Tr. 523). December 1, 2007, Plaintiff was discharged from physical therapy. (Tr. 447). Plaintiff attended only one of five sessions – the initial evaluation – and she was discharged due to lack of compliance. (Tr. 447).

When Plaintiff followed up with neurologist Dr. Mellick in October 2007, she denied any headache pain and reported experiencing significantly fewer headaches. (Tr. 480). She did complain of having four seizures in the past week, consisting of right arm twitching and an inability to communicate, but she denied any falling or "major seizures". (Tr. 480). November 5, 2007, Plaintiff returned to the ER complaining of a headache, double vision, and difficulty walking. (Tr. 466).

11

Plaintiff reported some recent falls, with increasing difficulty ambulating following a fall that resulted in her striking her head. (Tr. 466). She also reported "having more seizures over the last several days", but Plaintiff's daughter revealed Plaintiff had actually not taken her seizure medication over the past two to three days. (Tr. 466). Plaintiff presented as weak, with difficulty lifting her legs to ambulate, and her daughter reported Plaintiff was "walking with a stooped-over gait and kind of staggering from side to side as if she was drunk." (Tr. 466). A CT scan showed images within normal limits, with no extra-axial fluid collection, no intracerebral hemorrhage or evidence of mass effect, and no acute intracranial process. (Tr. 476). In November 2007, Plaintiff had three seizures during an office visit with Dr. Hunt, and an ambulance was called. (Tr. 905).

Plaintiff saw Dr. Hunt eight times during January through March 2008. (Tr. 556–63). At these visits, she generally complained of nausea (Tr. 557), anxiety and depression (Tr. 559–62), chronic pain including back pain and headaches (Tr. 559–63), frequent falls (Tr. 560–62), and complications from Crohn's disease (Tr. 560–61). At one point, Plaintiff was off Topamax, one of her seizure medications. (Tr. 560). At another visit, Dr. Hunt increased Plaintiff's anxiety medication, and his treatment notes state Plaintiff "needs to follow [up with] Dr. Mellick [the neurologist]." (Tr. 561). On February 29, 2008, Plaintiff reported experiencing more falls since going off Depakote, one of her seizure medications. (Tr. 562).

At the request of Disability Determination Services, Plaintiff underwent a psychological consultative exam with Dr. Richard Halas on May 5, 2008. (Tr. 416–19). Plaintiff presented in a disheveled and somewhat unkempt manner, but she was reasonably oriented in time, place, and person. (Tr. 416). Plaintiff seemed cooperative yet hesitant, and Dr. Halas assessed her grooming as poor and below average, with her hair disheveled. (Tr. 416). He assessed Plaintiff as being

12

dependent, with a flat, tense, and anxious presentation. (Tr. 416). Plaintiff showed no specific problems with thought fragmentation, and her responses here coherent and relevant, but she did have a significant poverty of speech. (Tr. 416). At times, Plaintiff was observably tearful. (Tr. 417). While she admitted feelings of hopelessness, helplessness, and worthlessness, she denied any thoughts of hurting herself or others. (Tr. 417). Plaintiff showed relatively high levels of anxiety, with her hands trembling and sweating. (Tr. 417). She showed no problems with hallucinations, delusions, paranoid ideations, or misinterpretations. (Tr. 417).

Though Plaintiff's memory for past events was good, her short-term memory was below average. (Tr. 417). She was able to do simple calculations quickly, and was fast and accurate in doing Serial 7s. (Tr. 417). Her concentration skills were good and Dr. Halas estimated Plaintiff's general intelligence to fall in the average range. (Tr. 417). Plaintiff mentioned her numerous medical problems and hospitalizations to Dr. Halas, indicating she has been hospitalized so many times she does not remember when or where. (Tr. 418).

Plaintiff reported going to bed around 10:00pm but having difficulty falling asleep until after 1:00am. (Tr. 417). She wakes early most days to let her dogs outside. (Tr. 417). Plaintiff's three adult children live at home with her, and two of them are disabled. (Tr. 418). Plaintiff has three dogs she helps care for, and she told Dr. Halas she shares the household chores with her daughters and husband. (Tr. 418). Though she had many friends in the past, Plaintiff reported currently having few friends. (Tr. 418). For fun, Plaintiff likes to read, watch television, and spend time with her dogs. (Tr. 418). On a good day, she takes the dogs to the park. (Tr. 418). Plaintiff does not attend church, but reads the Bible daily. (Tr. 418). Though she has a valid driver's license, Plaintiff stated she had not driven since 2006. (Tr. 418). According to Dr. Halas's notes, "[w]hen questioned as to long-term

13

potentialities, [Plaintiff] indicate[d] that it is primarily her physical health problems that keep her from working competitively." (Tr. 419).

Dr. Halas found Plaintiff would have little or no difficulty sitting, but he assessed her abilities to stand, walk, lift, carry, and handle objects as poor and below average. He described her speech as slow, constricted, anxious, and tearful. (Tr. 419). He listed her disorders as major depression, recurrent type, and generalized anxiety disorder. (Tr. 419). He also stated she had severe psychosocial stressors, and a GAF score of 45, indicating serious symptoms. (Tr. 419). Dr. Halas opined Plaintiff is markedly impaired in her ability to relate to others because her psychological and emotional problems are likely to cause problems in her interactions with others. (Tr. 419). Her ability to maintain attention for simple, repetitive tasks was not found to be impaired, but Dr. Halas found Plaintiff markedly impaired in her ability to withstand the stresses and pressures associated with day-to-day work, indicating her psychological problems would quickly become exacerbated in a normal work environment. (Tr. 419).

Plaintiff continued to treat with Dr. Hunt for her various disorders throughout 2008. (Tr. 538–44). On October 14, 2008, Plaintiff reported to Brown Memorial Hospital complaining of shaking and stating she "want[ed] pain medication." (Tr. 535). She reported shaking spells over the past three days, which occurred intermittently and for various durations. (Tr. 535). She did not appear to have any confusion or postictal symptoms following the shaking spells. (Tr. 535). Plaintiff did report she had not taken her anti-seizure medication doses that day. (Tr. 535). She also reported having a fever of 102, nausea and vomiting within the past several days, and chronic loose stools from Crohn's disease. (Tr. 535). At the hospital, Plaintiff's temperature was 101.6. (Tr. 535). When she arrived at the hospital, "she appeared to be shaking her legs [and clenching her fists]

14

voluntarily". (Tr. 535). The ER doctor "asked [her] to stop this and she did." (Tr. 535). She was not postictal, and her examination was normal, though "[p]sych appear[ed] to be quite variable." (Tr. 535–36). The listed provisional diagnoses were malnutrition and a possible seizure. (Tr. 536).

Plaintiff saw Dr. Hunt several more times in October and November 2008, complaining of – among other things – pain, depression, and seizures. (Tr. 537, 554–55). At an appointment for medication refills, Plaintiff stated she believed the personnel in the office were attempting to induce seizure activity in her. (Tr. 554). Dr. Hunt explained no one would intentionally do that. (Tr. 554). In December 2008, she continued complaining of seizures and reported falling and difficulty standing. (Tr. 553, 551). At one visit, Plaintiff reported hallucinations. (Tr. 551). Dr. Hunt noted she refused to take her seizure medications because they made her more depressed. (Tr. 551).

On December 17, 2008, Plaintiff was admitted to the hospital directly from Dr. Hunt's office after reportedly having a seizure the previous night, though no one witnessed the seizure. (Tr. 454, 457). The records note a history of seizure disorder, but also note a history of noncompliance. (Tr. 454). Plaintiff was awake and alert, but somewhat confused. (Tr. 455). Her lungs were clear, her heart rate was normal, and her abdomen was soft, nontender, and nondistended, with normal bowel sounds. (Tr. 455). Plaintiff had slurred speech and some ataxia on the finger-to-nose test, but the remainder of her neurological exam was normal. (Tr. 455). During an EEG on December 19, 2008, no seizure activity was noted by the EEG technician and the EEG was considered normal. (Tr. 460, 464). An MRI the same day also showed only normal findings. (Tr. 463).

Plaintiff continued seeing Dr. Hunt in early 2009, complaining of UTI symptoms, seizures, depression and anxiety, difficulty walking, pain, sleep problems, and Crohn's disease flare ups, among other things. (Tr. 531–33, 708–10). Plaintiff reported frequent falls and stated she uses a

15

walker. (Tr. 532). Dr. Hunt's notes from January 2009 appear to reference a wheelchair, but it is not a prescription. (Tr. 532). Dr. Hunt referred Plaintiff to CRNP Workman for her depression, but Plaintiff did not follow up with Workman. (Tr. 707, 710). On February 4, 2009, Dr. Hunt wrote a note stating Plaintiff was "medically disabled for the entire year of 2008". (Tr. 549). When Plaintiff saw Dr. Hunt on March 30, 2009, she reported experiencing seizures over the past several days, which had left her unable to remember the past two days very well. (Tr. 707). Dr. Hunt advised her to follow up with neurologist Dr. Rosenberg, and in April 2009 Dr. Hunt again mentioned Plaintiff was to follow up with Workman for her depression. (Tr. 706–07). A test result from April 2009 did not indicate a pattern consistent with Crohn's disease. (Tr. 716).

Plaintiff followed up with Dr. Rosenberg in May 2009. Her EEG was "a moderately abnormal study due to excessive slow activity in the background . . . consistent with diffuse cerebral dysfunction." (Tr. 792). No epileptiform activity was seen. (Tr. 792). Dr. Rosenberg stated Plaintiff has a blacking out spell about every two to three days. (Tr. 793). Her cranial nerves II through XII were unremarkable. (Tr. 793). Her motor exam showed normal strength in all her extremities and her reflexes were equal and symmetric. (Tr. 793). Dr. Rosenberg did note Plaintiff used a walker. (Tr. 793). While sensation seemed to be intact to touch and vibration, Dr. Rosenberg noted Plaintiff reported a subjective decreased appreciation of touch and vibration on the left side. (Tr. 793). Dr. Rosenberg assessed epilepsy and increased Plaintiff's Topamax dose. (Tr. 793–94).

Dr. Hunt's treatment notes from May 27, 2009 state Plaintiff needs a prescription for a wheelchair because of her difficulties walking and standing, but it does not appear he actually prescribed one. (Tr. 705). In June 2009, Dr. Rosenberg stated Plaintiff's epilepsy was controlled and continued her current medications. (Tr. 795). He reported Plaintiff had experienced no seizures or

16

headaches, and had no side effects from her medications. (Tr. 796). He planned to continue her medication and see her again in six months. (Tr. 796). Plaintiff underwent a stress test in July 2009, which revealed a LVEF of 71%, normal global function, and normal sinus rhythm. (Tr. 769).

Throughout 2009, Plaintiff continued to see Dr. Hunt, complaining of severe knee pain, depression and anxiety, falls, UTI symptoms, and Crohn's complications. (Tr. 923–28). Dr. Hunt continued refilling Plaintiff's medications, diagnosed osteoarthritis, and indicated Plaintiff was to follow up with a number of different doctors. (Tr. 923, 926–27). In October 2009, Dr. Rosenberg reported Plaintiff had been seizure free since June 2009 and was tolerating her medication well, with no side effects. (Tr. 789). He reiterated to Plaintiff that she could not drive until she had been seizure free for six months. (Tr. 789). He did note she was "getting somewhat limited by a painful knee", and Dr. Rosenberg's assessment was epilepsy, currently controlled. (Tr. 790). Plaintiff told Dr. Hunt her last seizure had been "a long time ago", and Dr. Hunt addressed Plaintiff's knee pain by referring her to an orthopedic specialist. (Tr. 922). Plaintiff told Dr. Hunt she felt much better in October 2009, but she continued to follow up with him to treat her various disorders. (Tr. 918–21, 929–32). In February 2010, Dr. Hunt noted some noncompliance and a normal physical exam. (Tr. 920).

A March 11, 2010 record from Dr. Hunt states he prescribed oxygen and a wheelchair for Plaintiff, and he noted Plaintiff was using the wheelchair at her next appointment. (Tr. 850, 919). At that appointment, Plaintiff reported balance difficulties and stated she had passed out twice, but Dr. Hunt noted she had stopped taking her Topamax. (Tr. 919). In April 2010, Plaintiff told Dr. Hunt she was staying in bed more often, and in May 2010 she stated she had been experiencing a bad bout of depression for about four months. (Tr. 915, 917). Dr. Hunt's medical records show Plaintiff continued to report depression, anxiety, pain, and Crohn's disease problems until August 2010. (Tr.

17

912–15).

Cooperative Disabilities Investigations Unit (CDIU) Report

When the Disability Determination Service reviewed Plaintiff's claim for benefits and her medical records, inconsistencies caused the appearance that fraud or similar fault could be involved in her claim due to possible exaggeration or fabrication of symptoms. (Tr. 423). Because of this, the Disability Determination Service conducted an investigation through CDIU. (Tr. 423). On September 17, 2008, two detectives initiated surveillance near Plaintiff's house and eventually made contact with Plaintiff. (Tr. 424). Plaintiff was ungroomed, disheveled, and had food stains on her clothing. (Tr. 424). Plaintiff reported no one really cooks for the household, stating most meals consist of frozen dinners. (Tr. 425). Plaintiff told the detectives she spends most of her time in bed. (Tr. 425). The detective did not observe a walker, wheelchair, or canes. (Tr. 425). Plaintiff said these items were on the house's second floor, and the detective did not enter the residence due to debris and garbage piled near the door. (Tr. 425). They stated the narrow path through the visible family room would not allow access by wheelchair or walker, and also saw her exit the residence without using a cane or walker. (Tr. 424–25).

The questionable information that concerned the bureau and led to the investigation included inconsistencies regarding Plaintiff's reported use of a cane or wheelchair, in spite of treating sources not mentioning these things and hospital records indicating normal gait. (Tr. 428). Additionally, Plaintiff had reported she was too ill to cook or clean, but told Dr. Halas she shares in the household chores and sometimes goes to the park with her dogs. (Tr. 428). Ultimately, the investigators determined "[t]he preponderance of the evidence does not suggest [Plaintiff] provided incomplete or inconsistent information." (Tr. 160). They found the evidence suggests Plaintiff has some

18

somatization and has always been overly focused on her perceived pain and limitations, but stated her presentation with investigators was consistent with her presentation at the psychological evaluation and at various hospital stays. (Tr. 160). They reported her statements regarding her daily functioning were consistent throughout the file and supported by her appearance. (Tr. 160).

RFC Assessments

*Dr. Congbalay – Physical RFC*

On August 7, 2007, consulting physician Dr. Maria Congbalay evaluated Plaintiff's physical RFC. (Tr. 399–406). She found Plaintiff can lift or carry 25 pounds frequently and 50 pounds occasionally. (Tr. 400). She also found Plaintiff can stand, walk, or sit for six hours in an eight-hour workday, and is unlimited in her abilities to push or pull, but can only occasionally climb ladders, ropes, or scaffolds. (Tr. 400–01). Dr. Congbalay also opined Plaintiff has no established manipulative, visual, or communicative limitations. (Tr. 402–03). She found Plaintiff must avoid concentrated exposure to hazards, such as machinery and heights. (Tr. 403). Dr. Conglabay found Plaintiff's symptoms attributable to a medically determinable impairment, but found the severity of the symptoms and their alleged effects on function inconsistent with the total medical and nonmedical evidence. (Tr. 404). She stated she had given at least some weight to Plaintiff's treating physician, but found Plaintiff's statements inconsistent with evidence in the record. (Tr. 404).

*Dr. Cruz – Physical RFC*

State consulting physician Dr. Teresita Cruz assessed Plaintiff's physical RFC on March 16, 2009. (Tr. 677–84). Dr. Cruz opined Plaintiff could lift or carry ten pounds frequently and 20 pounds occasionally. (Tr. 678). She also found Plaintiff can sit, stand, or walk about six hours in an eight-hour day, and is unlimited in her ability to push and pull. (Tr. 678). Dr. Cruz noted Plaintiff reported

19

using a walker, but found no physical findings to explain her alleged difficulties walking. (Tr. 679).

Dr. Cruz acknowledged a medical record indicating Plaintiff was using a cane, but found no

evidence it had been medically prescribed. (Tr. 679). She opined Plaintiff can never climb ladders,

ropes, or scaffolds, but can occasionally balance, stoop, crouch, and crawl. (Tr. 679). Dr. Cruz found

Plaintiff had no established manipulative, communicative, or visual limitations. (Tr. 680–81). She

stated Plaintiff should avoid all exposure to hazards, including machinery and heights. (Tr. 681).

Overall, Dr. Cruz found that while Plaintiff's symptoms were attributable to a medically

determinable impairment, "the severity is exaggerated and partially credible." (Tr. 682). Again, she

noted no cane, walker, or wheelchair had been prescribed,[1] noting Plaintiff had not used an

ambulatory aid at her psychological consulting exam. (Tr. 682). Further, she stated no physical

findings explain Plaintiff's purported inability to walk. (Tr. 682). Dr. Cruz also found Plaintiff's

statements inconsistent, noting that while Plaintiff stated she cannot get out of bed and her daughter

brings her food in bed, she told Dr. Halas she gets up early to let her dogs outside, sometimes goes

to the park with her dogs, and shares household chores with her family. (Tr. 682).

*Dr. Semmelman – Mental RFC*

Consulting psychiatric examiner Dr. Patricia Semmelman completed a Psychiatric Review

Technique and mental RFC assessment on March 17, 2009. (Tr. 686–703). Dr. Semmelman found

Plaintiff has a mood disorder and anxiety disorder. (Tr. 689). She opined Plaintiff has moderate

restrictions in the following areas: activities of daily living; maintaining social functioning; and

maintaining concentration, persistence, or pace. (Tr. 696). She found Plaintiff had no episodes of

---

1. Though Dr. Hunt did eventually prescribe a wheelchair, he did not do so until 2010, after Dr. Cruz
completed her assessment. (Tr. 850).

decompensation. (Tr. 696).

In her mental RFC assessment, Dr. Semmelman found Plaintiff not significantly limited in the following areas: her ability to remember locations and work-like procedures; her ability to understand, remember, and carry out very short and simple instructions; her ability to understand and remember detailed instructions; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; her ability to sustain an ordinary routine without special supervision; her ability to work in coordination with or proximity to others without being distracted by them; her ability to make simple work-related decisions; her ability to ask simple questions or request assistance; her ability to accept instructions and respond appropriately to criticism from supervisors; her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; her ability to maintain socially appropriate behavior and to adhere to basis standards of neatness and cleanliness; her ability to be aware of normal hazards and take appropriate precautions; her ability to travel in unfamiliar places or use public transportation; and her ability to set realistic goals or make plans independently of others. (Tr. 700).

Dr. Semmelman found Plaintiff moderately limited in her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and her ability to interact appropriately with the general public. (Tr. 700–01). She did not find Plaintiff markedly impaired in any category. (*See* Tr. 700–01). Dr. Semmelman noted Plaintiff has an estimated low-average to average IQ and can understand and follow one-to-three step,

21

uncomplicated oral and written directions. (Tr. 702). She also stated the medical record does not indicate Plaintiff has any memory problems. (Tr. 702).

Dr. Semmelman noted some inconsistencies in Plaintiff's record, including the fact that Plaintiff reported she and her family share household chores including cooking and that she walks her dogs, but reported to CDIU that no one really cooks or cleans. (Tr. 702). Dr. Semmelman noted the record showed no problems in the areas of concentration and attention. (Tr. 702). She also noted Plaintiff's history of depression, though she noted most of Dr. Hunt's 2007 treatment records do not show psychological complaints. (Tr. 702). She also mentioned an inconsistency with regard to whether Plaintiff reported depression, anxiety, or both. (Tr. 702). Dr. Semmelman additionally stated no records report the Plaintiff to be disheveled or unkempt, but this is not accurate. (Tr. 702). The CDIU investigators who saw Plaintiff in September 2008 described her as ungroomed and disheveled, with food stains on her clothing. (Tr. 424). Further, when Dr. Halas examined Plaintiff in May 2008, she presented in a "disheveled and somewhat unkempt manner." (Tr. 416). Dr. Semmelman drew attention to Dr. Hunt's notes indicating Plaintiff is often noncompliant. (Tr. 702). Further, Dr. Semmelman commented that Plaintiff's function report indicated she related all right with others, has at least one friend who visits her, and occasionally goes to church. (Tr. 702).

Due to these inconsistences, and bolstered by the fact Plaintiff never sought any kind of psychiatric treatment aside from medication, Dr. Semmelman found Plaintiff's complaints less than credible. (Tr. 702). She gave less weight to Dr. Halas's findings of marked impairments with regard to her ability to relate to others "in light of the other evidence". (Tr. 702). Ultimately, Dr. Semmelman concluded Plaintiff can interact occasionally and superficially with others, and can receive instructions and ask questions appropriately in a smaller or more solitary, less public-to-

22

nonpublic work setting. (Tr. 703). She also opined Plaintiff can cope with the ordinary and routine changes in a work setting that is not fast paced or of high demand. (Tr. 703).

*CRNP Workman – Mental RFC*

In February 2010, Workman evaluated Plaintiff's mental RFC. (Tr. 841). Notes indicate Plaintiff was casually dressed and neatly groomed, with a slow gait, and was using two canes. (Tr. 841). The report noted motor retardation and rigidity in her musculoskeletal system. (Tr. 841). Plaintiff's mood was depressed, anxious, and fearful, and she had a depressed, blunted affect. (Tr. 841). Her thought process was tangential and circumstantial, and her thought contexts included hopelessness, worthlessness, and hypochondriasis. (Tr. 841). Plaintiff diagnosed with depression, generalized anxiety disorder, PTSD, and a cognitive disorder. (Tr. 842).

Workman assigned Plaintiff a current GAF of "31/40" and stated Plaintiff's physical conditions exacerbate her mental health conditions. (Tr. 842). She stated she had extreme restrictions in the following areas: activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 843). She further found Plaintiff has had marked, repeated episodes of decompensation, each of extended duration. (Tr. 843). Additionally, Workman reported Plaintiff demonstrates "a complete inability to function independently" outside her home, and opined she is unable to work. (Tr. 843). Dr. Hunt agreed Workman's assessment accurately represented Plaintiff's condition. (Tr. 848).

*Physical Therapist Schiff – Physical RFC*

Physical Therapist Randall W. Schiff conducted a lengthy physical RFC assessment for Dr. Hunt and Plaintiff's attorney on April 16, 2010. (Tr. 805–13). Schiff diagnosed Plaintiff with rheumatoid arthritis, Crohn's disease, seizures, cardiomyopathy, sleep disorder, diabetes, diabetic

23

neuropathy, depression, anxiety disorder, posttraumatic stress disorder, malabsorption from gastric bypass, and GERD. (Tr. 805). Plaintiff reported numerous problems, including frequent falls and general balance problems. (Tr. 806). Schiff stated Plaintiff "is unable to work" and uses a rolling walker or canes to ambulate. (Tr. 806). He stated she cannot walk very far and has problems with stairs. (Tr. 806). Additionally, he stated Plaintiff can no longer do housework and cooks only by using the microwave. (Tr. 806). He reported she primarily spends her time sitting or sleeping. (Tr. 806).

Plaintiff rated her tail bone pain as 7/8, her left knee pain 7–8/10, her right knee pain 6–7/10, her wrist pain as 5/10, and her neck pain as 6/10. (Tr. 806). Schiff reported Plaintiff was drowsy for his entire examination and would doze off without constant stimulation and interaction. (Tr. 807). Further, he stated Plaintiff was "in danger of toppling over if not supported by a chair or lying down." (Tr. 807). He concluded Plaintiff "was obviously having sleep disturbance problems". (Tr. 807). Schiff found Plaintiff has "adequate cervical spine active range of motion", a negative neurological exam, and cervical spine strength within normal limits, though poor posture aggravates her neck musculature. (Tr. 807). He also found Plaintiff also has "adequate but painful" lumbar spine motion. (Tr. 807). Specifically, he stated she experiences dizziness and instability. (Tr. 807).

Schiff reported Plaintiff had 2/5 tone and strength in her abdominal muscles, 3/5 strength with increased back pain in her lumbar paraspinals, and 3-/5 strength with increased back pain in her hip musculature. (Tr. 808). He found Plaintiff has full ankle range of motion and 4/5 ankle muscle strength, but fatigues quickly. (Tr. 808). He also stated Plaintiff has right ankle discomfort with joint play and mobility testing. (Tr. 808). Her knee range of motion is within normal limits, but Schiff noted immediate and significant pain in her left knee with carilaginous tibial rotation tests and

24

also found knee joint crepitus. (Tr. 808). He further stated Plaintiff has very limited left quadricep and hamstring strength and found her left knee gives her inadequate support. (Tr. 808). Schiff reported she has adequate hip range of motion available to her except internal rotation, which is restricted bilaterally. (Tr. 809). Additionally, Schiff found Plaintiff has significant hip muscular weakness and inadequate strength for her body size and weight. (Tr. 809).

Schiff stated Plaintiff has a full range of motion in her fingers and thumbs and acceptable hand strength, but cannot sustain strength for repetitive activity. (Tr. 809). He also found her wrist range of motion is within normal limits, but she demonstrated strength deficits in wrist radial deviation and supination. (Tr. 809). Though Plaintiff has adequate elbow range of motion, Schiff reported she has generalized weakness in her elbows. (Tr. 809–10). He further stated Plaintiff has no significant difficulty trying to elevate her hands above her head. (Tr. 810). However, she cannot keep her arms up for any length of time or repetitively raise them because of shoulder weakness and left shoulder pain and she has very limited elevation strength in her shoulders. (Tr. 810). Functionally, Schiff found Plaintiff has very poor balance and is at a high risk of falling all the time. (Tr. 810). Because of this, he found she needs constant hand support to steady herself. (Tr. 810). He also found balance problems, left knee pain, and lower back pain render Plaintiff unable to physically squat; at best, he found she can get in and out of a chair with two-handed support. (Tr. 810). Additionally, Schiff found Plaintiff physically unable to kneel as she would not be able to get herself off the floor without someone's assistance. (Tr. 811).

Schiff stated Plaintiff was ambulating with a rolling walker, reporting she could take a few steps without it but is at "extremely high risk for fall". (Tr. 811). According to Schiff, "[Plaintiff] ambulated slowly with [the] rolling walker for 3 minutes 16 seconds, covering 146 ft., before having

25

to sit and rest" due to pain and fatigue. (Tr. 811). Further, he stated Plaintiff needed two-hand support to ascend or descend steps and did these steps one step at a time. (Tr. 811). She was able to do steps with one handrail and support of another, but Schiff reiterated Plaintiff's high risk of falling without two-hand support. (Tr. 811). He found she has no problems sitting. (Tr. 811).

Schiff found Plaintiff could only stand for around five minutes – with hand support – before pain and fatigue required her to sit. (Tr. 811). He stated Plaintiff should not try to crawl, was physically unable to climb ladders, and cannot reach overhead very well. (Tr. 811). Further, he found Plaintiff cannot stoop or bend adequately and did not recommend she engage in these activities. (Tr. 811). Though drowsiness delayed her reaction times and ability to stay on task without "nodding off", Schiff stated Plaintiff has adequate hand and finger dexterity. (Tr. 812). He did note her difficulties staying on task without continual intervention and conversation. (Tr. 812).

Schiff found Plaintiff cannot lift items from the floor occasionally or frequently due to balancing problems. (Tr. 812). He also found Plaintiff cannot do any repetitive or occasional lifting to her head and that she is physically unable to lift any weight above her head. (Tr. 812). Because he found Plaintiff needs to use a walker, Schiff stated Plaintiff cannot carry any weight. (Tr. 812). He also found Plaintiff's shoulder and arm strength limits her ability to slide weight on a workbench, and that Plaintiff cannot stand long enough without hand support to perform occasional or repetitive static pushing or pulling. (Tr. 812). He did find Plaintiff can move up to 30 pounds in a rolling cart, "hanging on to it as if it were her rolling walker" but cannot maneuver the cart because of strength and pain problems. (Tr. 813). He stated Plaintiff could only move the cart 67 feet before having to stop. (Tr. 813). Overall, Schiff stated Plaintiff is functioning at a less than sedentary level, and opined she would be unable to work in a competitive work environment. (Tr. 813). Dr. Hunt agreed

26

this assessment accurately represented Plaintiff's conditions. (Tr. 848).

Administrative Hearing

Plaintiff testified at the ALJ hearing on March 12, 2010, but there was no VE testimony. (*See* Tr. 37–61). Much of the hearing testimony focused on a conversation between Plaintiff's attorney and the ALJ regarding Plaintiff's medical records pertaining to depression. (Tr. 37–49). The ALJ briefly questioned Plaintiff about her family and living situation. (Tr. 50–51). Plaintiff testified Dr. Hunt prescribed her wheelchair and oxygen approximately two years earlier.[2] (Tr. 51–52). She further testified she uses the oxygen when she has "a bad day" and stated she uses it several times a week during the winter and less frequently during the warmer weather. (Tr. 52–53). Plaintiff also mentioned pain and testified she had been taking medication for depression and anxiety continuously since 1999 because she becomes extremely depressed without her mediation. (Tr. 53–54, 56). The ALJ requested pharmacy records back to 2006 to "plug in the hole" between her treatment and onset date. (Tr. 58, 60). He then concluded the hearing, stating:

> [A]s soon as those records come in, I'll be able to put the decision together. *We're finding you disabled*, it's just a question of how far back we can go. We just need to piece in some evidence, so, *it's going to find you disabled*, but whether it's back to '07 or '06, that'll depend on what comes in.

(Tr. 60–61) (emphasis added).

The ALJ's Decision

The ALJ found Plaintiff's date last insured to be September 30, 2009. (Tr. 14). He also found she had not engaged in substantial gainful activity during the period between her alleged onset date and date last insured. (Tr. 14). The ALJ found Plaintiff suffers from the following severe

---

2. In fact, the only medical record actually stating Dr. Hunt had prescribed a wheelchair for Plaintiff is dated March 11, 2010. (Tr. 850).

impairments: (1) a seizure disorder; (2) an affective disorder; (3) a gastrointestinal disorder; (4) fibromyalgia; and (5) a history of cardiomyopathy. (Tr. 14). The ALJ stated those impairments "cause significant limitation regarding [Plaintiff's] ability to perform basic work activities". (Tr. 15). In addition to Plaintiff's severe impairments, the ALJ also considered her other impairments, including hypotension, diabetes mellitus, obesity, history of Crohn's disease, and history of UTIs. (Tr. 16). He found she has moderate difficulties with social functioning and mild-to-moderate difficulties with concentration, persistence, or pace, but the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listing. (Tr. 17–18).

At step four of the five step sequential evaluation, the ALJ found Plaintiff retains the RFC "to perform a wide range of light work", with the following additional limitations: Plaintiff can frequently lift or carry ten pounds and occasionally lift or carry 20 pounds, but she cannot push or pull more than ten pounds. (Tr. 19). Plaintiff can sit, stand, or walk for up to six hours in an eight-hour workday. (Tr. 19). She can occasionally climb ramps or stairs, balance, crouch, crawl, kneel, and stoop. (Tr. 19). Secondary to her seizure disorder, Plaintiff must avoid exposure to hazardous situations such as unprotected heights or dangerous machinery. (Tr. 19). Considering her affective disorder, Plaintiff retains the capacity to understand, remember, and carry out simple instructions and perform simple, routine, and repetitive tasks consistent with unskilled work. (Tr. 19). Secondary to her moderate social limitations, Plaintiff is to have minimal interaction with others. (Tr. 19).

In determining Plaintiff's RFC, the ALJ found her statements concerning the intensity, persistence, and limited effects of her symptoms not credible. (Tr. 20). He noted she had been able to maintain skilled employment as a respiratory therapist for about eight years after and in spite of her voluntary psychiatric hospitalization for depression. (Tr. 20). He additionally noted that her

28

examinations frequently reported her abdomen was soft and not tender, with normal bowel sounds. (Tr. 20–24). Regarding Plaintiff's seizure disorder, the ALJ mentioned the ER visit during which Plaintiff appeared to be shaking her legs voluntarily and stopped when asked to stop. (Tr. 24). The ALJ also mentioned Dr. Rosenberg opining Plaintiff's epilepsy was controlled with medication. (Tr. 26). The ALJ rejected CRNP Workman's assessment of Plaintiff's mental status as "unsupported by any mental health progress and by the totality of the medical evidence." (Tr. 26). Further, the ALJ found Dr. Hunt's progress notes fail to document a level of debility that would require Plaintiff to use oxygen or a wheelchair. (Tr. 26). According to the ALJ, "minimal objective evidence support[s] her claims of complete functional disability." (Tr. 27).

The ALJ found Plaintiff is unable to perform her past work. (Tr. 27). Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined jobs existed in significant numbers in the national economy that Plaintiff could have performed. (Tr. 28). Citing SSR 85-15, the ALJ stated "the basic mental demands of competitive, remunerative, unskilled work include the abilities to understand, carry out and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting on a sustained basis." (Tr. 28). The ALJ further found Plaintiff's mental limitations do not result in deficits which would preclude her performance of work requiring the ability to understand, carry out, and remember simple instructions and perform simple tasks. (Tr. 28). Stating he was using the Medical-Vocational Guidelines (grids) as a framework for his determination, he stated Plaintiff's limitations "had little or no effect on the occupational base of unskilled light work" and found her

not disabled.[3] (Tr. 28). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20

---

3. This decision likely came as quite a surprise to Plaintiff, given the ALJ's hearing statement, "We're finding you disabled". (Tr. 61).

C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step

evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

> 1. Was claimant engaged in a substantial gainful activity?
>
> 2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
>
> 3. Does the severe impairment meet one of the listed impairments?
>
> 4. What is claimant's residual functional capacity and can claimant perform past relevant work?
>
> 5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one

through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to

establish whether the claimant has the residual functional capacity to perform available work in the

national economy. *Id.* The court considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.* Only

if a claimant satisfies each element of the analysis, including inability to do other work, and meets

the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) &

416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff alleges the ALJ erred three ways. First, she alleges the ALJ improperly evaluated

treating and examining physician opinions. Second, Plaintiff argues the ALJ improperly assessed

her credibility. Finally, she argues the ALJ "was precluded from issuing a finding of 'not disabled'

when he failed to obtain vocational expert testimony despite Plaintiff's significant non-exertional

31

limitations." (Doc. 16, at 1).

<u>Treating Physician Rule</u>

Plaintiff contends the ALJ improperly evaluated treating and examining physician opinions – specifically, the opinions of Drs. Hunt and Halas. (Doc. 16, at 12–16). Because the ALJ properly evaluated the opinion evidence in Plaintiff's case, the Court affirms his evaluations.

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(1). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability; (4) consistency; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ. *Id.*

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion. *Id.* Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009). The "good reasons" an ALJ gives to discount a treating source's opinion must be "supported by the evidence in the case record". *Id.* at 406–07 (quoting SSR 96-2p, 1996 WL 374188, at *5). Failing to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243).

Plaintiff's primary treating physician, Dr. Hunt, never made his own RFC determination assessing Plaintiff's abilities, but he signed a document stating he agreed the evaluations completed by CRNP Workman and physical therapist Schiff "accurately represent the [Plaintiff's] condition." (Tr. 848). The Court addresses each of these assessments in turn before turning to Dr. Halas's psychological assessment.

*Workman Mental Assessment*

As a psychiatric nurse practitioner, Workman is not an acceptable treating source, but the ALJ was required to evaluate her opinion to assess Plaintiff's limitations. *See* 20 C.F.R. § 404.1513(d)(1). Without providing medical support for her findings, Workman found Plaintiff met a number of the A, B, and C criteria and demonstrated a complete inability to function independently outside her home. (Tr. 842–43). This assessment is inconsistent with the other evidence in the record, and substantial evidence does not support it.

While Workman found Plaintiff extremely or markedly limited in activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace, and episodes of decompensation (Tr. 843), the record shows otherwise. Plaintiff reported sharing household chores,

33

helping care for three dogs, rising early to let the dogs outside, taking the dogs to the park on a good day, going grocery shopping, occasionally going to church, spending time with a longtime friend who visits her, and going for rides with her husband (Tr. 150–51, 417–18). Moreover, Plaintiff did not state she has problems getting along with others, and she has never been fired from a job due to problems getting along with people. (Tr. 152–53). Also, Plaintiff consistently failed to follow up with Workman despite telling Workman she would do so, and despite Dr. Hunt's repeated recommendations. (*See* Tr. 635, 706–07, 709). The ALJ noted Plaintiff's activities of daily living and socialization are at least adequate, and also noted Dr. Halas's opinion that Plaintiff can follow simple one and two-step instructions, along with simple, repetitive tasks. (Tr. 24). The evidence thus does not support Workman's opinion – and by adoption, Dr. Hunt's opinion – of Plaintiff's mental limitations, and the ALJ gave good reasons for discounting this opinion by noting the inconsistencies between Plaintiff's medical records and reported activities, and her alleged symptoms. (*See* Tr. 26).

*Schiff Physical RFC Assessment*

In February 2010, physical therapist Schiff assessed Plaintiff's physical RFC as being extremely limited. (*See* Tr. 805–13). As a physical therapist, Schiff is not an acceptable treating source, but the ALJ was required to evaluate his opinion to assess Plaintiff's limitations. *See* 20 C.F.R. § 404.1513(d)(1). Moreover, Dr. Hunt adopted Schiff's physical RFC assessment as his own. (Tr. 848). According to Schiff's report, Plaintiff was drowsy for his entire examination, would doze off without constant stimulation and interaction, and was "in danger of toppling over if not supported by a chair or lying down." (Tr. 807). Schiff found Plaintiff has very poor balance and is at a high risk of falling all the time, requiring constant hand support to steady herself. (Tr. 810). He

found she cannot squat and has difficulty even rising from a chair. (Tr. 810). He found she cannot kneel and requires a rolling walker for balance, stating she could only take a few steps without it and could only walk with it for about three minutes without having to rest because of pain. (Tr. 811). Schiff also found Plaintiff cannot ascend or descend steps without two-handed support, and could only do a maximum of 14 steps without resting due to pain. (Tr. 811). He found she could only stand for about five minutes at a time and is physically unable to crawl or climb ladders. (Tr. 811). He further found her limited in her ability to reach over her head, her ability to stoop or bend at the waist, her ability to lift or carry any weight, and her ability to push or pull. (Tr. 812–13). Schiff did state Plaintiff has no problems sitting, but ultimately opined Plaintiff functions at a less-than-sedentary level. (Tr. 812–13). This drastically limited RFC is the assessment Dr. Hunt adopted as accurately representing Plaintiff's limitations. (Tr. 848).

The medical and other evidence does not support this dramatic list of impairments. No other medical record indicates Plaintiff has difficulties staying awake without constant stimulation and interaction, or that she is in danger of toppling over from a sitting position. Plaintiff never showed up for physical therapy sessions designed to help increase her strength, improve her ambulation, and return her to full work capacity. (Tr. 447–48). Dr. Rosenberg's notes show Plaintiff can control her seizure activity when she properly takes her anti-seizure medication. (Tr. 789–90, 795).

Dr. Hunt's records do not specifically mention prescribing a wheelchair for Plaintiff until 2010, at least two medical records indicate her gait is normal without an ambulatory aid, and at least one record notes normal strength in all her extremities. (Tr. 244, 507, 793, 850). Further, although Plaintiff reports using ambulatory aids, Plaintiff navigated the stairs and left her residence without an ambulatory device when the CDIU investigators went to speak with her in September 2008, and

35

they stated a path at the residence would not allow access for a walker or wheelchair. (Tr. 424–25). Overall, Schiff's RFC assessment describes someone significantly more limited than Plaintiff, in light of the medical evidence or her own reports. The ALJ noted the inconsistencies between the opinion Dr. Hunt adopted, the medical evidence, and Plaintiff's activities and these inconsistencies are good reasons providing substantial evidence supporting a decision not to give Dr. Hunt's opinion great weight. Moreover, statements Dr. Hunt made opining Plaintiff's inability to work speak to an issue reserved to the Commissioner and are not controlling. (*See* Tr. 549, 848).

*Dr. Halas Mental RFC Assessment*

In determining the appropriate weight to grant non-treating opinions, generally more weight is given to examining physicians such as Dr. Halas than to non-treating, non-examining physicians. 20 C.F.R. § 404.1527(c)(1). The ALJ discussed and considered Dr. Halas's opinion in his decision, ultimately determining the record does not support Dr. Halas's findings. (Tr. 24). The ALJ noted her activities of daily living and socialization are at least adequate, and also noted Dr. Halas's opinion that Plaintiff can follow simple one and two-step instructions, along with simple, repetitive tasks. (Tr. 24). While Dr. Halas opined Plaintiff's mental abilities to relate to others and withstand the stress of day-to-day work are markedly impaired (Tr. 419), the ALJ found he had accommodated even marked social impairments by including in his RFC determination a restriction limiting Plaintiff to work with only minimal interaction with others. (Tr. 19, 24).

Plaintiff's Brief reiterates the notion that Plaintiff spends all day barricaded inside her bedroom (Doc. 16, at 16), but Plaintiff spends time with a longtime friend who visits her (Tr. 151), goes shopping in stores (Tr. 112, 115, 150), and does not report any problems getting along with others, including authority figures (Tr. 151–53). These inconsistencies – noted by the ALJ – provide

substantial evidence and good reasons supporting the ALJ's determination that limiting Plaintiff to minimal interaction with others more than adequately compensates for her social impairments, whether they are marked (as Dr. Halas opined) or moderate (as the ALJ found). (*See* Tr. 19, 419).

Because the ALJ gave good reasons for the weight he gave all treating and examining physician opinions, the Court finds he did not err.

Credibility Determination

Plaintiff argues the ALJ improperly assessed her credibility. (Doc. 16, at 17). Specifically, Plaintiff objects to the "heavy emphasis" the ALJ placed on the fact that Plaintiff returned to work as a respiratory therapist following her 1995 psychiatric hospitalization and on objective physical exams showing Plaintiff's abdomen was soft and not tender, and she also objects to what she describes as the ALJ insinuating Plaintiff may not actually have Crohn's disease. (Doc. 16, at 17–18). She claims the ALJ did not explain his credibility determination in terms of the factors set forth in SSR 96-7p, and urges the Court to remand. (Doc. 16, at 18). Because the ALJ properly assessed Plaintiff's credibility, the Court affirms the ALJ's credibility determination.

The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination.").

Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

The ALJ found inconsistencies calling Plaintiff's credibility into question and discussed at length the inconsistencies between Plaintiff's alleged symptom severity, the objective medical evidence, and Plaintiff's reported activities. (Tr. 20). The objective medical evidence simply does not support symptoms as severe as Plaintiff contends. While Plaintiff certainly did present to the ER

38

numerous times complaining of abdominal pain, nausea, and diarrhea, she was frequently discharged when abdominal test results were normal and doctors were unable to determine the etiology of her symptoms. (*See, e.g.,* Tr. 199, 228, 282, 341, 328). Though the ALJ did state Plaintiff was diagnosed with Crohn's disease after reading about it (Tr. 21), he also considered all the medical evidence, including consideration of Plaintiff's history of Crohn's disease. (Tr. 16, 19). Moreover, the ALJ did not place too much emphasis on Plaintiff's abdominal exams showing her abdomen was soft and nontender. In combination with the other medical evidence, these examinations support the determination – based on the other evidence – that her gastrointestinal problems are not so severe as to be disabling. (*See, e.g.,* Tr. 536, 544, 550, 551).

Plaintiff also frequently presented to the ER complaining of seizure activity, but she did not take her seizure medications consistently and Dr. Hunt noted her medical noncompliance several times. (Tr. 454, 466, 535, 551, 560, 603, 920). When Plaintiff takes her seizure medications as prescribed, she remains seizure-free, and Dr. Rosenberg's 2009 treatment notes indicate Plaintiff's epilepsy is controlled with medication, noting she had been seizure-free for four months in October 2009. (Tr. 795–96, 789–90). Plaintiff even told Dr. Hunt in October 2009 that her last seizure had been "a long time ago." (Tr. 922). Moreover, the record indicates she exaggerated her seizure symptoms at least once, when "she appeared to be shaking her legs [and clenching her fists] voluntarily" at the ER. (Tr. 535). Doctors asked her to cease doing this, and she stopped. (Tr. 535). She was not postictal, her examination was normal, and the ER notes state only that she "may" have had a seizure within the past day or so. (Tr. 536).

Additionally, Plaintiff's conservative and noncompliant approach to treating her various disorders indicates her symptoms are not as severe as she alleges. Not only has she inconsistently

taken her seizure medication, but she was discharged from physical therapy after failing to attend any sessions following the initial evaluation. (Tr. 447). Further, despite repeated recommendations to follow up with CRNP Workman for her depression, Plaintiff did not see Workman in an outpatient setting until she assessed Plaintiff's mental RFC – almost a year after Dr. Hunt last recommended following up with her. (Tr. 635–36, 706–07, 709, 841).

Plaintiff inconsistently reported her daily activities, as well, further supporting the ALJ's adverse credibility determination. She told a person at the disability office and stated in her disability report that she stays upstairs in her room and does not leave her bed, only to contradict herself by saying she goes to the store to grocery shop twice a month and uses a cart to get around. (Tr. 112, 115, 150). She further stated she does not go to church, yet later said she goes to church "once in a great while".(Tr. 115, 151). Plaintiff's reported daily activities include reading and watching television, going for rides with her husband, and spending time with her dogs, but she says she does not do these things often. (Tr. 148, 151, 418). Though she reported currently having few friends, Plaintiff also stated a longtime friend visits her. (Tr. 151, 418).

Plaintiff gave several, varying reports of her cooking and cleaning activities. She stated she often feels too ill to cook or clean (indicating she at least occasionally performs these activities) (Tr. 144); she stated she does not prepare her own meals (Tr. 149); and she told CDIU investigators no one really cooks for the household (Tr. 425). Plaintiff also stated she does not do any house or yard work (Tr. 151), but she told Dr. Halas she shares the household chores with her daughters and husband (Tr. 418). Again, Plaintiff stated she does not leave her bed (Tr. 115), but she also reported helping care for three dogs, rising early to let the dogs outside, taking the dogs to the park on a good day, going grocery shopping, occasionally going to church, and going on rides with her husband (Tr.

40

150–51, 417–18).

Overall, Plaintiff's reported symptom severity and her own reports of her activities are highly inconsistent with each other and with the objective medical records. While he did discuss Plaintiff returning to work after her 1995 psychiatric hospitalization (Tr. 20), the ALJ relied on far more than that to reach his decision. In making his credibility determination, the ALJ discussed the objective medical evidence, Plaintiff's history of noncompliance and that noncompliance's effect on her symptoms, and her reported daily activities. (*See generally* Tr. 20–27). Because the ALJ properly assessed Plaintiff's credibility and provided detailed, clear, good reasons for his determination, the Court affirms the ALJ's credibility determination.

VE Testimony and the Grids

Plaintiff argues the ALJ improperly issued a finding of not disabled because he relied on the grids and failed to obtain VE testimony to assess the extent to which Plaintiff's nonexertional limitations erode the occupational base at the "light work" level. (Doc. 16, at 18).

Once an ALJ has determined a plaintiff cannot perform her past relevant work, the burden shifts to the Commissioner at step five to show there are other jobs in significant numbers in the economy the plaintiff can perform, consistent with her RFC, age, education, and work experience. *Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 771 (6th Cir. 1987). The Commissioner may meet this burden by reference to the grids, unless the plaintiff suffers nonexertional limitations that significantly limit the range of work permitted by her exertional limitations. *Id. See also Kimbrough v. Sec'y of Health & Human Servs.*, 801 F.2d 794, 796 (6th Cir. 1986). If a plaintiff has exertional *and* nonexertional impairments, the ALJ cannot rely solely on the grids. *Santilli v. Astrue*, 2012 WL 609382, *3 (N.D. Ohio 2012). But, "it is *only* when 'the nonexertional limitation restricts a

41

claimant's performance of a full range of work at the appropriate residual functional capacity level that nonexertional limitations must be taken into account and a nonguidelines determination must be made.'" *Kimbrough*, 801 F.2d at 796 (emphasis in original) (quoting *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981)). Therefore, a plaintiff "must show an impairment that significantly impairs [her] ability to do a full range of work at a designated level." *Id.*

When a plaintiff's nonexertional limitations do prevent her from performing the full range of work at a designated level – for example, the "light work" level, which the ALJ designated for Plaintiff here – then the ALJ must come forward with some reliable evidence showing there remain a significant number of jobs the plaintiff can perform, taking into account exertional and nonexertional limitations. *Santilli*, 2012 WL 609382, at *4. In the absence of reliable evidence showing nonexertional limitations do not significantly erode the occupational base at the plaintiff's designated level, the ALJ may not rely on the grids. *See Boley v. Astrue*, 2012 WL 680393, *9 (E.D. Mich. 2012) (citing *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

Here, the ALJ found Plaintiff suffers a number of severe impairments, including an affective disorder. (Tr. 14). Further, he found Plaintiff has moderate difficulties with social functioning and mild-to-moderate difficulties with concentration, persistence, or pace. (Tr. 18). In relevant part, the ALJ determined Plaintiff retains the RFC:

> to perform a wide range of light work . . . with the following additional limitations.
> . . . Secondary to her affective disorder, the [Plaintiff] retains the capacity to understand, remember and carry-out simply instructions and perform simply, routine and repetitive tasks as consistent with unskilled work activity. Secondary to moderate social limitations, she is to have minimal interaction with others.

(Tr. 19). Thus, amid exertional limitations, the ALJ limited Plaintiff to light, unskilled work where she must have only minimal interaction with others. Without consulting a VE, the ALJ used the

42

grids "as a framework" to support his finding that Plaintiff is not disabled because jobs exist in significant numbers in the national economy that she can perform. (Tr. 27–28). Without explanation or citing specific evidence, the ALJ determined Plaintiffs nonexertional limitations "had little or no effect on the occupational base of unskilled light work" and he therefore found her not disabled. (Tr. 28). As detailed below, this was error.

The cases examining whether a nonexertional impairment erodes the designated occupational base to the extent requiring the ALJ to support his finding with reliable evidence generally fall into two categories: (1) cases where the ALJ *did* find nonexertional limitations to be severe and incorporated them into the RFC, but found the nonexertional limitations had no actual effect on the occupational base; and (2) cases where plaintiffs contend the ALJ incorrectly found substantial evidence did not support alleged nonexertional limitations and therefore did not incorporate them into the RFC assessment. *Compare Boley*, 2012 WL 680393, at *9 (remanding where the ALJ found moderate difficulties in social functioning and included a limitation to minimal interaction with coworkers and supervisors in the RFC, but relied on the grids); *and Rhone v. Astrue*, 2012 WL 3637647 (N.D. Ohio 2012), *adopted by* 2012 WL 3637244 (remanding where the ALJ included mental limitations in the RFC but concluded, citing no evidence, these did not substantially effect the occupational base); *and Sweeney v. Astrue*, 2010 WL 5559134 (N.D. Ohio 2010), *adopted by* 2010 WL 5464735 (remanding where the ALJ included mental limitations in the RFC but failed to include them in the hypothetical posed to the VE, then found no effect on the occupational base without providing reliable evidence); *and Shelman*, 821 F.2d at 316 (remanding where the ALJ included a nonexertional limitation in the RFC but relied on the grids when the limitation would significantly effect the occupational base); *with Santilli*, 2012 WL 609382 (affirming where the ALJ

43

relied on the grids but did not include social limitations in the RFC); *and Franks v. Astrue*, 2012 WL 1096138, *adopted by* 2012 WL 1096137 (affirming where the ALJ did not include nonexertional limitations in the RFC, finding instead the plaintiff could perform the *full range* of light work); *and Lovejoy v. Comm'r of Soc. Sec.*, 2000 WL 1675546 (affirming where the ALJ found plaintiff's mental impairments "not severe" and did not include nonexertional limitations in the RFC); *and Bryant v. Chater*, 110 F.3d 63 (6th Cir. 1997) (affirming where the ALJ did not include nonexertional limitations in the RFC); *and Kimbrough*, 801 F.2d at 794 (affirming where the ALJ did not include nonexertional limitations in the RFC, instead finding the plaintiff could perform the full range of sedentary work).

Plaintiff's case presents the first of these scenarios to the Court. The ALJ found Plaintiff has a severe mental impairment; the ALJ found Plaintiff has moderate difficulties in social functioning; the ALJ incorporated mental limitations in Plaintiff's RFC, limiting Plaintiff to unskilled work and minimal interaction with others; and the ALJ then used the grids to conclude these limitations had no significant impact on the occupational base, without citing any evidence.

Just as the ALJ had in *Boley*, the ALJ in Plaintiff's case relied on SSR 85-15 for the proposition that the basic mental demands of unskilled work "include the abilities to understand, carry out and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting on a sustained basis." SSR 85-15, 1985 WL 56857, *4; *see also Boley*, 2012 WL 680393, at *10; (Tr. 28). The ALJ here stated "the evidence . . . shows that [Plaintiff's] documented mental limitations do *not* result in deficits which would preclude . . . work requiring the ability to understand, carry out and remember simple instructions and perform simple tasks" (Tr. 28) (emphasis in original), but he was notably silent with

44

regard to whether Plaintiff's social difficulties have any impact on her ability to respond appropriately to supervision and coworkers.

Although unskilled work deals primarily "with things (rather than data or people)", 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202(g), someone performing unskilled work must be able to respond appropriately to supervision and coworkers on a sustained basis. SSR 85-15, 1985 WL 56857, *4. A substantial loss of this ability to deal with supervisors and coworkers "severely limit[s] the potential occupational base." *Id.* The ALJ in Plaintiff's case did not address why Plaintiff's moderate social limitations – accommodated in the RFC – do not erode the occupational base for light work. He simply made a blanket statement concluding Plaintiff's additional limitations have little or no effect, making no attempt to support his conclusion. (Tr. 28).

As described above, case law suggests that where, as here, the ALJ included a nonexertional limitation in the RFC but relied on the grids without obtaining VE testimony, the case should be remanded. *See Boley*, 2012 WL 680393; *Rhone*, 2012 WL 3637647; *Sweeney*, 2010 WL 5559134; *Shelman*, 821 F.2d at 316. The Court finds that is the correct result here as well and remands this case to the ALJ for further development of the record, including VE testimony, to determine whether – given the social limitations the ALJ specifically placed on her in his RFC determination – Plaintiff can perform unskilled jobs existing in significant numbers in the national economy.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision unsupported by substantial evidence to the extent the Commissioner did not obtain VE testimony. Therefore, the Commissioner's decision denying benefits is reversed, and the case is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further

45

proceedings consistent with this opinion.

IT IS SO ORDERED.

_____s/James R. Knepp, II_____
United States Magistrate Judge